MJC/JKM2011R00645

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA** | : |
| | :    Criminal No. WDQ13-0460 |
| **v.** | : |
| | :    **(Conspiracy to Commit Wire Fraud,)** |
| **RICHARD SHUSTERMAN and** | :    **18 U.S.C. § 1349; Wire Fraud, 18** |
| **JONATHAN E. ROSENBERG,** | :    **U.S.C. § 1343; Forfeiture, 18 U.S.C.** |
| | :    **§ 981(a)(1)(C))** |
| **Defendants.** | : |
| | : |

...oOo...

## INDICTMENT

### COUNT ONE

### (Conspiracy to Commit Wire Fraud)

The Grand Jury for the District of Maryland charges that:

#### Relevant Persons and Entities

1.      At all times relevant to this Indictment, **RICHARD SHUSTERMAN** ("**SHUSTERMAN**"), the defendant, was a shareholder and president of International Portfolio, Inc. ("IPI"), a Delaware corporation that used the address of 200 Barr Harbor Drive, Suite 400, West Conshohocken, Pennsylvania.

2.      At all times relevant to this Indictment, IPI had a bank account ending in 3464 at Wilmington Trust of Pennsylvania, in Villanova, Pennsylvania.   **SHUSTERMAN** was the sole signatory on the account.   IPI also had a bank account ending in 8364 at Bank of America, West Conshohocken, Pennsylvania.   **SHUSTERMAN** and ROBERT M. FELDMAN ("FELDMAN") were the signatories on the account.

3.      At all times relevant to this Indictment, ROBERT M. FELDMAN was the sole shareholder and president of Delaware Valley Consulting, Inc., a Pennsylvania corporation with its office in Gladwyne, Pennsylvania.   The company had a bank account at Bryn Mawr Trust

Company, Bryn Mawr, Pennsylvania, and FELDMAN was a signatory on the account. FELDMAN was also the managing member and president of United Consulting, Inc. ("United Consulting"), a Pennsylvania corporation with a principal office in Gladwyne, Pennsylvania. Its bank accounts were held at Bryn Mawr Trust Company, Bryn Mawr, Pennsylvania, and FELDMAN was a signatory on the accounts. Pursuant to a joint venture agreement of June 21, 2006, FELDMAN, **SHUSTERMAN,** United Consulting and IPI were jointly engaged in the business of buying and selling consumer debt, including medical debt portfolios. In 2009, FELDMAN exercised an option in the agreement to become a part-owner of IPI with **SHUSTERMAN**.

4.      At all times relevant to this Indictment, **SHUSTERMAN** and FELDMAN represented IPI to be a company with expertise and experience in the field of medical accounts receivable, including their purchase, valuation, collection, and resale.

5.      At all times relevant to this Indictment, **JONATHAN E. ROSENBERG** ("**ROSENBERG**"), the defendant, and DOUGLAS A. KUBER ("KUBER"), were members and operators of Account Receivable Services, LLC ("ARS"), a Nevada limited liability company. ARS's principal office was located at 110 Greene Street, New York, New York. ARS had a bank account ending in 2214 at Commerce Bank, which later became TD Bank, in New York, New York. **ROSENBERG** and KUBER were the sole signatories on the account. ARS and its associated special purpose entities ("SPEs"), hereinafter collectively referred to as "ARS," were primarily involved in the business of investing in medical accounts receivable purchased from IPI using funds borrowed from investors interested in asset-based lending. The SPE bank accounts were also maintained at Commerce Bank, later TD Bank, in New York, New York.

6.      At all times relevant to this Indictment, **ROSENBERG** was the managing member and president of JER Receivables, LLC ("JER Receivables"), a New Jersey limited

liability company located in Roseland, New Jersey. JER Receivables had a bank account ending in 4039 at Bank of America, Roseland, New Jersey. **ROSENBERG** was a signatory on the account. **ROSENBERG** was also the managing member and president of International Portfolio Access, LLC ("IPA"), a New Jersey limited liability company located in Roseland, New Jersey. IPA had a bank account at PNC Bank, N.A., Philadelphia, Pennsylvania. JER Receivables and IPA were both primarily in the business of recruiting investors for medical accounts receivable portfolios purchased from IPI.

7.      At all times relevant to this Indictment, **ROSENBERG** and KUBER were members and operators of Portfolio Scope, LLC ("Portfolio Scope"), a Delaware limited liability company. Portfolio Scope had a bank account ending in 0033 at Commerce Bank, later TD Bank, New York, New York. KUBER was the sole signatory on the account. Portfolio Scope was a shell company with no active business purpose.

8.      At all times relevant to this Indictment, Platinum Partners was an investment advisor and had its principal office in New York, New York. Platinum Partners organized and managed several investment funds commonly referred to as hedge funds ("Platinum funds"). The Platinum funds were ·in the business of investing in high-yield investments and financial instruments. The Platinum funds included the following: Platinum Credit Resources, LLC; Platinum Partners Value Arbitrage Fund, L.P.; Centurion Credit Resources, LLC; Level 3 Capital Fund, LP; and Titanium Capital Partners, LLC; hereinafter collectively referred to as "Platinum."

9.      At all times relevant to this Indictment, Roundstone Healthcare Investments, LLC, and Roundstone Healthcare Partners I, LP, both of Acton, Massachusetts, and associated entities, collectively referred to as "Roundstone," were private equity companies in the business of investing in medical accounts receivable portfolios purchased from IPI.

10.     At all times relevant to this Indictment, Greenfish Fund, LP, Greenfish II, LP and associated entities, Delaware limited liability partnerships with principal offices located in Philadelphia, Pennsylvania, collectively referred to as "Greenfish," were private equity companies in the business of investing in medical accounts receivables purchased from IPI.

11.     At all times relevant to this Indictment, the International Institute of Tropical Agriculture ("IITA"), a non-governmental philanthropic organization, managed foreign aid and conducted research to develop solutions for hunger and poverty in Africa.   IITA had its principal office in Ibadan, Oyo State, Nigeria.   IITA invested part of its operating capital in certificates of deposit, money market shares and other conservative, liquid investments.   IITA maintained a bank account ending in 8691 at Citibank, New York, New York.

a.     At all times relevant to this Indictment, IITA was governed by a Board of Trustees.   D.L., a resident of West River, Maryland, was a member of the Board of Trustees and Chair of the Audit Committee.   In those roles, D.L. reviewed short term investment opportunities for IITA's operating capital.   D.L. also directed his own personal investments, including investments in IPI debt portfolios.

12.     At all times relevant to this Indictment, Eton Park Capital Management, LP ("Eton Park") was a hedge fund with its principal office in New York, New York.   Eton Park was in the business of investing in high-yield investments.

**Background**

**A.     IPI's Purchase of Medical Accounts Receivables from Hospitals**

13.     On or about December 19, 2006, IPI paid approximately $5,720,029 to purchase approximately $1.874 billion in medical accounts receivable from Public Health Trust of Miami-Dade County, Florida, which operated Jackson Memorial Hospital in Miami, Florida, collectively referred to as "JMH."   The accounts receivable were comprised of approximately

4

1,244,203 in past due patient accounts that JMH had been unsuccessful in collecting. In accordance with the Master Purchase Agreement, JMH provided IPI with data containing the patients' personal identifiers and payment histories.

        a.      After a dispute between IPI and JMH over the accounts receivable, an arbitration award dated December 19, 2008, required JMH to provide to IPI $360 million of accounts receivable by December 31, 2008. The arbitration award also required JMH to provide to IPI accounts receivable every month beginning in January 2009 of at least $10.4 million per month for two years.

      14.      On or about November 15, 2007, IPI received approximately $1.92 billion in medical accounts receivable from Hospital Management Associates ("HMA") in Naples, Florida, in exchange for approximately $18.75 million paid in installments by IPI. The accounts receivable were comprised of approximately 2,441,022 past due patient accounts that HMA had been unsuccessful in collecting. In accordance with the purchase agreement, HMA provided IPI with data containing the patients' personal identifiers and payment histories.

        a.      On or about December 23, 2008, IPI contracted to receive approximately $132 million more in medical accounts receivable from HMA, which were delivered on December 24, 2008. Under the terms of the agreement, HMA provided additional accounts receivable to IPI on May 6, 2009, August 12, 2009, and November 23, 2009.

      15.      On or about June 2, 2008, IPI paid approximately $1,250,253 to purchase approximately $175 million in medical accounts receivable from Multicare Health System ("Multicare"), in Tacoma, Washington. The accounts receivable were comprised of approximately 187,289 past due patient accounts that Multicare had been unsuccessful in collecting. Multicare provided IPI with data containing the patients' personal identifiers and payment histories.

**B.**     **The Promotion of the Medical Accounts Receivable Investment Model**

16.     Beginning in or about June of 2007, **SHUSTERMAN, ROSENBERG,** FELDMAN, and KUBER began promoting an investment model to individual investors and investment fund managers that involved the sale and management of investment portfolios containing medical accounts receivable acquired and managed by IPI, hereinafter referred to as "IPI debt portfolios." Investors were told that the IPI debt portfolios could achieve certain projected rates of return based upon the cash flow generated by two sources: (1) the collection of outstanding patient accounts receivable using various data analyses and debt collection strategies and (2) the resale of the IPI debt portfolios to purchasers in the debt-buying secondary market, such as large collection agencies or law firms specializing in debt collections.

17.     To implement the investment model, **SHUSTERMAN, ROSENBERG,** FELDMAN, and KUBER agreed that **SHUSTERMAN**, through IPI, would batch accounts receivable from IPI's inventory into discrete debt portfolios with specified total outstanding account balances, which would then be offered for sale to investors.   **SHUSTERMAN, ROSENBERG,** FELDMAN, and KUBER also agreed that **SHUSTERMAN**, through IPI, would manage all the collection efforts for each debt portfolio IPI sold. Potential investors were told that the medical accounts receivable IPI purchased directly from hospitals where the debt was incurred had a higher collection potential than ones purchased from unrelated third-party debt buyers or servicers.   Potential investors were also told that various analyses and collection strategies would be employed on their behalf to generate liquidation rates sufficient to readily meet the investors' cash flow benchmarks and establish the portfolio's potential resale value.

a.     First, the debt portfolio would be analyzed to identify the nature and range of the patient accounts contained in the portfolio, referred to as data "stratifications."

b.      Second, the debt portfolio would be "scrubbed" to remove uncollectable accounts, such as deceased and bankrupt debtor accounts, or to add needed collection information, such as a patient's missing social security number.

c.      Third, IPI would place the portfolios for collections with its network of collection agencies in accordance with IPI's overall collection strategy.

d.      Fourth, the collection agencies would be required to wire the funds they collected directly into the investors' special purpose bank accounts, some of which were controlled and reviewed by independent escrow agents.

e.      Fifth, IPI would manage the collection process and track the funds collected and, if necessary, place the accounts with a different collection agency and/or employ different collection strategies.

f.      Finally, **SHUSTERMAN**, **ROSENBERG**, FELDMAN, and KUBER would assist the investor in choosing the right time to sell the debt portfolio based upon demonstrated total collection activity and bids obtained from independent purchasers in the debt-buying industry.

18.    **SHUSTERMAN**, **ROSENBERG**, FELDMAN, and KUBER represented that revenues from collections would come from two sources.

a.      The first source of collection revenues would come from the collection agencies engaged by IPI to liquidate the IPI debt portfolios.  The collection agencies would wire the proceeds of their collection activity, minus their collection fee, into special purpose bank accounts opened by the investors.

b.      The second source of collection revenues would come from "direct payments."  Direct payments are payments by or on behalf of former patients that are collected by hospitals after the patients' outstanding accounts have been sold to a third party, such as IPI.

Hospitals usually aggregate such patient payments and forward them in a single payment to the party that purchased the patients' accounts, such as IPI.   If IPI sold the accounts receivable, IPI would have to forward the direct payments to the new purchaser.   Consequently, investors and/or their escrow agents would see direct payments from IPI being deposited into their SPE bank accounts.   Indeed, part of the portfolio management service provided by IPI for each of the debt portfolios sold to investors was to account for and reconcile the receipt of direct payments and then forward them to the investors' bank accounts.

### The Scheme and Artifice to Defraud

19.   From in or about March 2007 until in or about July 2010, in the District of Maryland and elsewhere,

### RICHARD SHUSTERMAN and
### JONATHAN E. ROSENBERG,

the defendants herein, ROBERT M. FELDMAN and DOUGLAS A. KUBER, did knowingly devise and intend to devise a scheme and artifice to defraud investors and lenders in medical accounts receivable and to obtain money and property from such investors and lenders in excess of $275 million by means of materially false and fraudulent pretenses, representations, and promises ("the scheme to defraud").

### The Conspiracy to Defraud

20.   From in or about March 2007 until in or about July 2010, in the District of Maryland and elsewhere,

### RICHARD SHUSTERMAN and
### JONATHAN E. ROSENBERG,

the defendants herein, ROBERT M. FELDMAN and DOUGLAS A. KUBER, did knowingly and willfully conspire, combine, confederate, and agree with each other, and other persons known and unknown to the Grand Jury, to commit wire fraud, that is, to knowingly execute and

attempt to execute the scheme to defraud and for the purpose of executing and attempting to execute the scheme to defraud did knowingly transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce certain writings, signs, signals, pictures and sounds, in violation of Title 18, United States Code, Section 1343 ("the conspiracy to defraud").

**Object of the Conspiracy**

21.     The object of the conspiracy to defraud was for **SHUSTERMAN, ROSENBERG,** FELDMAN, and KUBER to obtain money using materially false, and fraudulent representations and omissions regarding purchase prices, collection results, and resale values of IPI medical debt portfolios in order to persuade investors to invest in those portfolios.

**Manner and Means of the Conspiracy**

A.     **The Fraudulent Inflation of Purchase Prices for IPI Debt Portfolios to Obtain Larger Investor Loans**

22.     It was part of the conspiracy to defraud that **SHUSTERMAN, ROSENBERG,** and KUBER inflated and caused to be inflated the purchase prices for IPI debt portfolios that ARS purchased with loan proceeds provided by Platinum, IITA, and other investors.

23.     It was further part of the conspiracy to defraud that **SHUSTERMAN, ROSENBERG,** and KUBER, negotiated and agreed upon two different purchase prices for each IPI debt portfolio that Platinum and IITA financed on behalf of ARS: the actual purchase price that IPI charged ARS for its portfolios and the inflated purchase price that was communicated to Platinum, IITA and others.

24.     It was further part of the conspiracy to defraud that **SHUSTERMAN, ROSENBERG,** and KUBER made and caused to be made fraudulent Purchase and Sale Agreements, Escrow Agreements, Collateral Security Agreements, Promissory Notes, and other

9

documents, which reflected inflated purchase prices for IPI debt portfolios that were approximately 5% to 10% higher than the actual price ARS paid to IPI for those portfolios.

25.     It was further part of the conspiracy to defraud that **SHUSTERMAN**, **ROSENBERG**, and KUBER artificially set higher purchase prices for the IPI debt portfolios ARS financed through Platinum and IITA because IPI agreed to kickback the loan proceeds in excess of the true purchase prices to **ROSENBERG** and KUBER through one of their other companies, including Portfolio Scope.

26.     It was further part of the conspiracy to defraud that **SHUSTERMAN**, **ROSENBERG**, and KUBER evaded the escrow and collateral security agreement requirements that Platinum and IITA established to account for ARS's use of investor loans and to track the receipt and expenditure of collections generated by the IPI debt portfolios.

a.     Pursuant to the escrow and collateral security agreements, the loan proceeds from Platinum and IITA were to be deposited into the bank accounts of the special purpose entities ("SPE") created by ARS to buy and hold the collateral for the loans, *i.e.*, the medical debt portfolios.

b.     Funds deposited into the SPE bank accounts could only be disbursed with the consent of an independent escrow agent, and even then, ARS was prohibited from receiving any money generated by the IPI debt portfolios until the principal and interest on Platinum's and IITA's loans were paid in full.   Use of the loan proceeds to pay personal expenses or transactional costs associated with ARS's purchase of the debt portfolios, such as start-up expenses, commissions or finder's fees, was not authorized by the escrow and collateral security agreements.

27.     It was further part of the conspiracy to defraud that **SHUSTERMAN**, **ROSENBERG**, FELDMAN, and KUBER used a contractual provision in the Purchase and Sale

Agreements, titled "Purchase Price Adjustment," to fraudulently conceal and facilitate kickbacks to **ROSENBERG** and KUBER of Platinum and IITA loan proceeds in excess of the actual price ARS paid for IPI debt portfolios.   Under the "Purchase Price Adjustment" provision, ARS would be entitled to a partial "refund" or rebate for any "unqualified accounts" that failed to meet the terms of the purchase agreements, such as when a debtor was deceased or bankrupt. IPI kicked back to **ROSENBERG** and KUBER the inflated portion of the Platinum and IITA loans under the guise of refunds for unqualified accounts as a way to evade the requirements of the escrow and collateral security agreements and to provide **ROSENBERG** and KUBER with loan proceeds to which they were not entitled.    At times, IPI also kicked back to **ROSENBERG** and KUBER the inflated portion of the Platinum and IITA loans under the guise of "consulting fees" and "advisory fees."

28.    It was further part of the conspiracy to defraud that once the Platinum and IITA loans were funded in the amount of the inflated purchase prices, ARS wired the loan proceeds to IPI's bank account.   IPI, in turn, wired between 5% and 10% of the loan proceeds back to **ROSENBERG** and KUBER using banks accounts belonging to other corporate entities owned by **ROSENBERG** and KUBER, including Portfolio Scope, which were beyond the scrutiny of the escrow agent and the established escrow procedures.

29.    It was further part of the conspiracy to defraud that, between in or about June 2007 and in or about March 2009, **SHUSTERMAN, ROSENBERG,** and KUBER made or caused to be made kickbacks of investor loan proceeds to **ROSENBERG** and KUBER totaling approximately $8,318,718.

B.     **The Fraudulent Inflation of Collection Results**

30.    It was part of the conspiracy to defraud that **SHUSTERMAN, ROSENBERG,** FELDMAN, and KUBER, in order to induce existing investors to maintain and increase their

participation in the investment scheme and to persuade new investors to join, falsely represented the actual amount of collections and rates of liquidation of IPI debt portfolios.

31.     It was further part of the conspiracy to defraud that, beginning in or about July 2008, **SHUSTERMAN**, **ROSENBERG**, FELDMAN, and KUBER caused IPI to wire money to ARS to fund periodic interest payments that ARS owed Platinum and IITA in order to fraudulently conceal from Platinum, IITA and other investors the inability of IPI debt portfolios to generate sufficient collections to meet the minimum debt service payments due to Platinum and IITA.

32.     It was further part of the conspiracy to defraud that **SHUSTERMAN**, **ROSENBERG**, FELDMAN, and KUBER created and caused to be created, between and among themselves, letters of understanding and loan agreements that recorded and tracked the amount of funds advanced by IPI to cover the periodic interest payments ARS owed to Platinum and to fund false collection deposits into IITA's SPE account (hereinafter "advances"), which documents and agreements were never made known to Platinum, IITA or the escrow agents for the ARS and IITA SPEs.   In accordance with those agreements, between in or about July 2008 and in or about December 2009, **SHUSTERMAN**, **ROSENBERG**, FELDMAN, and KUBER caused approximately 212 advances to be wired into the SPE bank accounts of the various ARS debt portfolios, which advances were subsequently used to make periodic interest payments due to Platinum and/or inflate the collection history of the respective Platinum and IITA debt portfolios.

33.     It was further part of the conspiracy to defraud that between in or about July 2008 and in or about March 2010, **SHUSTERMAN**, **FELDMAN**, **ROSENBERG** and KUBER falsely represented that IPI advances were a particular type of collection received during the liquidation of IPI debt portfolios called "direct payments."

a.      The co-conspirators falsely represented to Platinum and IITA that they were in compliance with escrow and collateral security agreements that required an accurate accounting of collections, including direct payments, which were deposited into the ARS SPE bank accounts created for each IPI debt portfolio ARS had purchased.

b.      Since IPI was the servicer of the medical accounts receivable and the party that purchased them from HMA, JMH, Multicare and other hospitals, the hospitals were required to forward their patients' direct payments to IPI, which was then required to forward them to the investors who had purchased the debt portfolios that contained the particular accounts receivable. On or about the dates when the periodic interest payments were due from ARS to Platinum, **SHUSTERMAN**, **ROSENBERG**, FELDMAN, and KUBER coordinated interstate wire transfers of the IPI advances into the ARS SPE bank accounts to falsely represent them as direct payments received from the hospitals and forwarded by IPI.

34.     It was further part of the conspiracy to defraud that **SHUSTERMAN**, **ROSENBERG**, FELDMAN, and KUBER fraudulently used the pretense of direct payments being wired into the SPE accounts to give the false impression that collections were robust and on track to meet projected liquidation rates and/or investment benchmarks.

35.     It was further part of the conspiracy to defraud that **SHUSTERMAN**, **ROSENBERG** and KUBER, when wiring or causing the wiring of the advances into the SPE accounts, used odd numbers and skewed totals to conceal the true purpose of the advances and make them appear to be direct payments wired during the ordinary course of the collection process.

36.     Between in or about July 2008 and in or about March 2010, **SHUSTERMAN**, **ROSENBERG**, FELDMAN, and KUBER made and caused to made false and misleading collection reports to deceive Platinum, IITA and other investors, and other potential investors,

such as Eton Park, by fraudulently inflating weekly collection totals by the amount of money IPI had advanced to ARS under the pretense of direct payments. The inflated collection reports created the false impression that collections from IPI debt portfolios were much higher than they actually were. In truth and fact, the actual collections for each of the ARS portfolios financed by Platinum and IITA were far below the projected liquidations for those portfolios.

37. It was further part of the conspiracy to defraud that between in or about July 2008 and in or about March 2010, **SHUSTERMAN, ROSENBERG,** FELDMAN, and KUBER falsely represented in weekly collection reports provided to Platinum and IITA that approximately $56,180,158 in "direct payments" were collected during the liquidation of IPI debt portfolios financed by Platinum and IITA investors.

38. It was further part of the conspiracy to defraud that in or about February 2009 **SHUSTERMAN, ROSENBERG,** FELDMAN, and KUBER, in order to induce IITA to invest more money in the investment model, falsely represented in a weekly collection report provided to IITA that a wire transfer of approximately $2 million into IITA's SPE bank account was from collections, when, in truth and fact, it was an advance from IPI to give the false appearance that collections were on track to meet projected investment benchmarks.

39. It was further part of the conspiracy to defraud that in or about February 2010 **SHUSTERMAN, ROSENBERG,** FELDMAN, and KUBER, in an attempt to induce Eton Park to invest in IPI debt portfolios, falsely represented in weekly collection reports provided to Eton Park that total net collections for four portfolios financed by Platinum were approximately $28.7 million when, in truth and fact, total net collections were approximately $2 million.

40. During the continued promotion, sale, and management of IPI debt portfolios, **SHUSTERMAN, ROSENBERG,** FELDMAN, and KUBER failed to disclose to existing and

potential investors and collection evaluators the existence and necessity of the IPI "advances" to cover interest payments and inflate collection histories.

**C.**   **False Representations About Purported Resales of IPI Debt Portfolios to Purchasers in the Debt-Buying Secondary Market**

41.   It was part of the conspiracy to defraud that, notwithstanding the demonstrably poor liquidation rates of IPI debt portfolios and the use of IPI advances to subsidize ARS, **SHUSTERMAN**, **ROSENBERG**, FELDMAN, and KUBER continued to promote the investment scheme to existing and potential investors by misrepresenting the collectability of the IPI debt portfolios and their potential resale value in the debt-buying industry, and by failing to disclose the poor collection results of previously purchased and managed IPI debt portfolios.

42.   It was further part of the conspiracy to defraud that **SHUSTERMAN**, **ROSENBERG**, FELDMAN, and KUBER agreed to have IPI manage the liquidation process for each IPI debt portfolio sold to or financed by an investor, and that at the time of the resale of the debt portfolio IPI would serve as an intermediary purchaser and seller of the debt portfolio ostensibly to protect IPI proprietorial information.   As the intermediary, IPI would buy back the debt portfolio from the original investor, purportedly solicit bids and then sell the portfolio to third party purchasers in the debt-buying industry without either the original investor or the new buyer knowing the identity of the other.   In this way, **SHUSTERMAN**, **ROSENBERG**, FELDMAN, and KUBER used IPI to artificially control both the sales and purchase price of the particular IPI debt portfolio being sold and to conceal the identity of the new buyers.   In addition, investors were told that the resale value of the IPI debt portfolios would be based upon (1) the demonstrated total collection activity for the portfolio and (2) bids from new purchasers in the debt-buying secondary market.

43.   It was further part of the conspiracy to defraud that **SHUSTERMAN**, **ROSENBERG**, FELDMAN, and KUBER, in order to induce investors to buy and/or maintain their investment positions in IPI debt portfolios, and to further conceal substantially lower than projected collection results, fraudulently repurchased and resold investors' IPI debt portfolios at artificially inflated prices that neither corresponded to a particular debt portfolio's actual collection results, nor to an asking price from a purchaser in the debt-buying industry.   In truth and fact, none of the IPI's debt portfolios financed or purchased by Platinum, Roundstone, Greenfish, or IITA was ever sold to a third party in the debt-buying industry.   For the ones that were falsely represented to have been sold to such third parties, the purchaser was actually another IPI investor or IPI itself.

44.   It was further part of the conspiracy to defraud that, as to IPI debt portfolios financed or purchased by Platinum, IITA, Roundstone, and Greenfish that were falsely represented to have been sold to purchasers in the debt-buying industry, **SHUSTERMAN** and FELDMAN sold them at prices higher than the investor's original purchase price or loan amount so as to create a contrived rate of return high enough to induce an existing investor to reinvest or a new investor to join the investment scheme.

45.   It was further part of the conspiracy to defraud that **SHUSTERMAN**, **ROSENBERG**, FELDMAN, and KUBER represented to Platinum, Roundstone, Greenfish, IITA and other investors that the IPI debt portfolios sold to them or used as collateral were comprised of medical accounts receivable that IPI had purchased on the primary market, that is, the accounts had been purchased directly from hospitals and medical providers after those institutions had exhausted their efforts to collect from their debtor patients.   In truth and fact, **SHUSTERMAN** and FELDMAN intentionally and fraudulently sold to some investors IPI debt

portfolios that IPI had previously sold to, and repurchased from, a different IPI investor and sometimes multiple investors.

46.     To conceal poor collection results and the artificiality of the resale prices for IPI debt portfolios, and to assure a continuing flow of new funding into the investment scheme, **SHUSTERMAN, ROSENBERG**, FELDMAN, and KUBER continued to solicit, and caused others to solicit, existing and prospective investors to purchase or finance IPI debt portfolios. In so doing, **SHUSTERMAN, ROSENBERG**, FELDMAN, and KUBER fraudulently used new investor funds to make interest and sale payments in order to meet the investment benchmarks of prior investors.

## Overt Acts

In furtherance of the conspiracy to defraud, and to effect the objects thereof, the defendants, and others known and unknown, committed the following overt acts in the District of Maryland and elsewhere:

## A.     The Fraudulent Inflation of Purchase Prices and the Kickback of Loan Proceeds Under the Guise of Unqualified Accounts

1.     On or about August 6, 2007, in reference to ARS's anticipated purchase of an IPI debt portfolio in the name of ARS Holding, LLC, using Platinum financing, **SHUSTERMAN** caused an email to be sent to KUBER stating that IPI was willing to "repurchase Unqualified Accounts up to 10%."

2.     On or about August 7, 2007, **ROSENBERG** and KUBER used an interstate wire to transmit the proceeds of a Platinum loan to IPI for the purchase of an IPI debt portfolio in the name of ARS Holding, LLC, for the purported price of $4,999,004.60.

3.     On or about August 7, 2007, after KUBER sent an email to **SHUSTERMAN** requesting that "the other funds" be sent to ARS, **SHUSTERMAN** emailed KUBER stating that "[t]he wire is going out in a few minutes."

4.     On or about August 7, 2007, and after Overt Acts 2 and 3, SHUSTERMAN used an interstate wire to transmit $499,900 to ARS's bank account with a reference in the wire to "refund non qualified accounts."

5.     On or about November 19, 2007, **SHUSTERMAN** emailed KUBER acknowledging the receipt of $1.7 million for the purchase of an IPI debt portfolio and requesting information on where to wire $85,000, which **SHUSTERMAN** referred to as a return of funds for non-qualified accounts.

6.     On or about November 19, 2007, KUBER responded to the foregoing email by asking **SHUSTERMAN** not to state the reason for the $85,000 payment in the wire transfer instructions.

7.     On or about March 6, 2008, in reference to ARS's anticipated purchase of an IPI debt portfolio in the name of Portfolio One, LLC, to be financed by Platinum for the purported purchase price of $29,249,627.29, **SHUSTERMAN** emailed **ROSENBERG** and KUBER telling them that the purchase agreement provided for "unqualified files at 6%" and their "refund" would be "limited to $1,746,000."

8.     On or about March 6, 2008, in reference to ARS's anticipated purchase of an IPI debt portfolio in the name of Portfolio Three, LLC, to be financed by Platinum, **ROSENBERG** emailed **SHUSTERMAN** asking him to compile a new IPI portfolio in the amount of $1 million "with a 6% rebate" and further stating that "[t]his portfolio is a Platinum deal."

9.     On or about March 6, 2008, in reference to Portfolio Three, LLC, **SHUSTERMAN** emailed **ROSENBERG** telling him that the purchase agreement would have a "6% cap based on the funding amount for unqualified files."

10.    On or about March 13, 2008, **SHUSTERMAN** wired or caused to be wired in interstate commerce $7,858,797.50 to Delaware Valley Consulting ("DVC"), representing FELDMAN's share of the proceeds from the sale of an IPI debt portfolio to ARS Portfolio One, LLC, for the purported price of $29,249,627.29.

11.    On or about March 13, 2008, **SHUSTERMAN** deposited or caused to be deposited into his personal bank account $8,058,797.50, representing his share of the proceeds from the sale of a portfolio to ARS Portfolio One, LLC, for the purported price of $29,249,627.29.

12.    On or about March 23, 2008, **SHUSTERMAN** emailed KUBER affirming that any collections for Portfolio Three should be wired into the SPE bank account set up for that portfolio, but the amount of $60,000, representing 6% of the purported purchase price, should be wired into the bank account of Portfolio Scope.

13.    On or about March 23, 2008, KUBER emailed instructions to **SHUSTERMAN** to wire an "Advisory Fee" to the bank account of Portfolio Scope.

14.    On or about May 13, 2008, **SHUSTERMAN** emailed KUBER and **ROSENBERG** acknowledging receipt of a prior email wherein KUBER told **SHUSTERMAN** that he intended to wire money to **SHUSTERMAN** for the purchase of Portfolio Six, but stated that he was "waiting for the escrow agent to approve it," and KUBER also provided the wiring instructions **SHUSTERMAN** had previously requested for the Portfolio Scope bank account.

15.    On or about June 27, 2008, **SHUSTERMAN** emailed **ROSENBERG** stating, "The buy rate prior to any adjustments is 3.42% for a funding amount of $3,160,743.16."

16.     On or about June 27, 2008, and after Overt Act 15, **SHUSTERMAN** emailed **ROSENBERG** stating that "the revised buy rate should be 3.59%.  Please confirm this will support the 5% unqualified."

17.     On or about June 30, 2008, in reference to the ARS portfolio called Slice Two, LLC, **ROSENBERG** emailed **SHUSTERMAN** stating that the purported price of $1 million should be in the purchase contract, but that ARS was "actually purchasing" $949,848.02 and the "Unqualified Accounts to be sent to ARS" should be $50,151.98.

18.     On or about July 4, 2008, in reference to Slice Two and Portfolio Seven, **ROSENBERG** sent an email to KUBER asking him if he had received "both rebate wires for $50,151.98 and $166,354.90 for the $1M file and the $3,327,098.07 file respectively."

19.     On or about July 31, 2008, **SHUSTERMAN** emailed KUBER acknowledging receipt of a prior email wherein KUBER stated, "The unqualified wire should be $155,719.88."

20.     On or about August 29, 2008, in reference to the portfolio called Slice Ten, LLC, **SHUSTERMAN** emailed KUBER and **ROSENBERG** stating, "Your wire arrived in the amount of $6,832,755.02.  I am traveling but want to wire Portfolio scope the rebate amount."

21.     On or about September 16, 2008, **SHUSTERMAN** emailed **ROSENBERG** stating he had "received his wire for slice 12 in the amount of $2,930,251.59.  A wire in the amount of $146,512.57 will be sent now to portfolio scope."

22.     On or about November 9, 2008, KUBER sent an email to **ROSENBERG** with the subject line "Rebate" requesting that IPI send $724,998.81 in two wire transfers, both labeled "Consulting."

23.     On or about November 10, 2009, **SHUSTERMAN** wired or caused to be wired a kickback of $713,971.69 to the bank account of Portfolio Scope in reference to IITA's financing of

ARS's purchase of a $10 million IPI debt portfolio and Platinum's financing of ARS's purchase of two debt portfolios totaling $4.5 million.

24.   On or about November 10, 2008, **SHUSTERMAN** wired or caused to be wired $6,675,000 to the business bank account of DVC, representing FELDMAN's share of $14.5 million that IPI received from the sale of a debt portfolio to ARS called Slice Thirteen, LLC, which was financed by IITA, and Slice Fourteen, LLC, and Slice Fifteen, LLC, both of which were financed by Platinum.

25.   On or about November 10, 2008, **SHUSTERMAN** deposited or caused to be deposited $6,675,000 into his personal bank account, representing his share of $14.5 million that IPI received from the sale of debt portfolios to ARS Portfolio Thirteen, LLC, which was financed by IITA, and ARS Portfolio Fourteen, LLC, and ARS Portfolio Fifteen, LLC, both of which were financed by Platinum.

26.   On or about the dates listed below, **SHUSTERMAN**, **ROSENBERG**, and KUBER fraudulently inflated or caused to be inflated the purchase prices listed in the following Purchase and Sale Agreements for IPI debt portfolios in order to obtain larger investor loans to fund kickbacks from IPI to **ROSENBERG** and KUBER.

| Date of Purchase and Sale Agreement | Name of ARS SPE Portfolio | Fraudulent Purchase Price | Actual Purchase Price | Kickback Amount |
|---|---|---|---|---|
| 6/27/2007 | Sanctuary Wealth Fund, LLC - JMH 1 | $1,857,878.63 | $1,688,981.93 | $168,897.50 |
| 6/27/2007 | Sanctuary Wealth Fund, LLC - JMH 2 | $408,375.00 | $371,250.00 | $37,125.00 |
| 8/6/2007 | IPI ARSH, LLC | $4,999,004.60 | $4,499,104.60 | $499,900.00 |
| 11/14/2007 | Sanctuary Wealth Fund, LLC - HMA 1 | $1,400,000.00 | $1,330,000.00 | $70,000.00 |
| 11/14/2007 | Account Receivable Services, LLC - HMA 2 | $300,000.00 | $285,000.00 | $15,000.00 |
| 12/20/2007 | IPI Titanium Holding, LLC | $25,000,000.00 | $23,750,000.00 | $1,250,000.00 |
| 3/10/2008 | Portfolio One, LLC | $29,249,627.29 | $27,500,000.00 | $1,749,627.29 |
| 3/21/2008 | Portfolio Three, LLC | $1,000,000.00 | $940,000.00 | $60,000.00 |

| 4/9/2008 | Portfolio Four, LLC | $6,000,000.00 | $5,700,000.00 | $300,000.00 |
|---|---|---|---|---|
| 4/9/2008 | Portfolio Five, LLC | $20,000,000.00 | $19,000,000.00 | $1,000,000.00 |
| 513/2008 | Portfolio Six, LLC | $2,935,250.84 | $2,788,488.30 | $146,762.54 |
| 7/2/2008 | Slice Two, LLC | $1,000,000.00 | $949,848.02 | $50,151.98 |
| 7/3/2008 | Slice Seven, LLC | $3,327,098.07 | $3,160,743.57 | $166,354.50 |
| 7/9/2008 | Slice Seven LLC | $1,670,275.71 | $1,595,804.82 | $74,470.89 |
| 7/22/2008 | Slice Eight, LLC | $3,065,222.89 | $2,909,503.01 | $155,719.88 |
| 7/30/2008 | Slice Nine, LLC | $2,997,609.11 | $2,847,728.65 | $149,880.46 |
| 7/30/2008 | Slice Nine, LLC | $4,496,413.66 | $4,271,592.98 | $224,820.68 |
| 9/2/2008 | Slice Ten, LLC | $6,832,755.02 | $6,491,117.26 | $341,637.76 |
| 9/5/2008 | Slice Ten, LLC | $3,167,149.32 | $3,008,791.85 | $158,357.47 |
| 9/12/2008 | Slice Ten, LLC | $4,800,029.44 | $4,560,014.94 | $240,014.50 |
| 9/5/2008 | Slice Eleven, LLC | $3,999,996.47 | $3,799,996.65 | $199,999.82 |
| 9/16/2008 | Slice Twelve, LLC | $2,930,251.59 | $2,783,739.02 | $146,512.57 |
| 9/25/2008 | Slice Twelve, LLC | $3,569,738.41 | $3,391,251.49 | $178,486.92 |
| 11/6/2008 | Slice Thirteen, LLC 1 | $1,429,006.17 | $1,357,555.86 | $71,450.31 |
| 11/6/2008 | Slice Thirteen, LLC 2 | $1,427,385.07 | $1,356,015.82 | $71,369.25 |
| 11/6/2008 | Slice Thirteen, LLC 3 | $1,427,403.38 | $1,356,033.21 | $71,370.17 |
| 11/6/2008 | Slice Thirteen, LLC 4 | $1,428,229.37 | $1,356,817.90 | $71,411.47 |
| 11/6/2008 | Slice Thirteen, LLC 5 | $1,432,411.91 | $1,360,791.32 | $71,620.59 |
| 11/6/2008 | Slice Thirteen, LLC 6 | $1,427,400.81 | $1,356,030.77 | $71,370.04 |
| 11/6/2008 | Slice Thirteen, LLC 7 | $1,428,139.55 | $1,356,732.57 | $71,406.98 |
| 11/6/2008 | Slice Fourteen, LLC | $3,300,000.00 | $3,135,000.00 | $165,000.00 |
| 11/6/2008 | Slice Fifteen, LLC | $1,200,000.00 | $1,140,000.00 | $60,000.00 |
| 2/18/2009 | Slice Twenty One, LLC 1 | $330,000.00 | $313,500.00 | $16,500.00 |
| 2/18/2009 | Slice Twenty One, LLC 2 | $330,000.00 | $313,500.00 | $16,500.00 |
| 2/18/2009 | Slice Twenty One, LLC 3 | $330,000.00 | $313,500.00 | $16,500.00 |
| 2/18/2009 | Slice Twenty One, LLC 4 | $330,000.00 | $313,500.00 | $16,500.00 |
| 2/18/2009 | Slice Twenty One, LLC 5 | $330,000.00 | $313,500.00 | $16,500.00 |
| 2/18/2009 | Slice Twenty One, LLC 6 | $440,000.00 | $418,000.00 | $22,000.00 |
| 2/18/2009 | Slice Twenty One, LLC 7 | $110,000.00 | $104,500.00 | $5,500.00 |
| 3/4/2009 | Slice Thirteen, LLC 8 | $300,000.00 | $285,000.00 | $15,000.00 |
| 3/4/2009 | Slice Thirteen, LLC 9 | $300,000.00 | $285,000.00 | $15,000.00 |
| 3/4/2009 | Slice Thirteen, LLC 10 | $300,000.00 | $285,000.00 | $15,000.00 |
| 3/4/2009 | Slice Thirteen, LLC 11 | $300,000.00 | $285,000.00 | $15,000.00 |
| 3/4/2009 | Slice Thirteen, LLC 12 | $300,000.00 | $285,000.00 | $15,000.00 |
| 3/4/2009 | Slice Thirteen, LLC 13 | $400,000.00 | $380,000.00 | $20,000.00 |
| 3/4/2009 | Slice Thirteen, LLC 14 | $100,000.00 | $95,000.00 | $5,000.00 |

**B.**   **The Fraudulent Inflation of Collection Results**

27.   On or about December 7, 2007, **SHUSTERMAN** emailed KUBER and **ROSENBERG** in reference to the projected rate of liquidations for an IPI debt portfolio noting various ways collections could be enhanced and stating "[t]hat should increase the liquidation rate to over 8.0%."

28.   On or about February 8, 2008, KUBER emailed **ROSENBERG** stating that an IPI debt portfolio that ARS had purchased about six months earlier was "nearly $500K short" of the money needed to make an interest payment to Platinum investors, which was "putting in jeopardy all of our current investments . . . and all future investments."

29.   On or about February 13, 2008, **ROSENBERG** emailed KUBER discussing ways to offset portfolio expenses with incoming collections before they were deposited into the SPE bank accounts because of the "problem of not being able to touch the restricted accounts."

30.   On or about March 31, 2008, **ROSENBERG** emailed **SHUSTERMAN** discussing how the "weekly liquidation report" supplied to Platinum reflected insufficient collections to pay the periodic interest payment to Platinum, and suggesting they "sell the whole file off now" so they "will not have to supply [Platinum] with a liquidation report and we can start fresh with other paper."

31.   On or about April 7, 2008, KUBER emailed **ROSENBERG** stating the liquidation letters **SHUSTERMAN** provided to ARS were a "complete joke and appear to be a fabrication for our benefit."

32.   On or about May 31, 2008, KUBER emailed **ROSENBERG** saying, "By July 4th, we need an extra $4.5M.  Then we need over $1M a month to pay ongoing interest.  There is no way that is going to happen . . . We are fucked . . . [t]he only way out is if Bob [FELDMAN] advances us the $ which will never happen."

33.    On or about June 2, 2008, **ROSENBERG** emailed KUBER requesting a spreadsheet "for every single outstanding Platinum" deal setting forth dates and amounts of upcoming interest payments owed to Platinum investors.

34.    On or about June 27, 2008, **ROSENBERG** and KUBER met in New Jersey to discuss an upcoming meeting with **SHUSTERMAN** and FELDMAN regarding the inability of the IPI debt portfolios to generate sufficient collections and the need for ARS to receive advances from IPI to cover upcoming interest payments due to Platinum investors.

35.    On or about July 2, 2008, **SHUSTERMAN, ROSENBERG**, FELDMAN, and KUBER met together at a restaurant in Philadelphia and agreed that, in order to conceal from Platinum and other investors the negligible collections generated by the IPI debt portfolios, and to assure Platinum's continued participation in the investment scheme, **SHUSTERMAN** and FELDMAN would cause IPI to advance money to ARS under the guise of "direct payments" to cover ARS's upcoming interest payments to Platinum, including $4.2 million due from ARS Titanium Holding, LLC.   At the meeting, **SHUSTERMAN, ROSENBERG**, FELDMAN, and KUBER further agreed that ARS would repay IPI from the future sale of tranches of the Titanium portfolio.

36.    On or about July 7, 2008, **ROSENBERG** emailed **SHUSTERMAN** stating that if they showed Platinum that the investment scheme worked "as initially told to them and we pay the interest payment on time without selling a different file, *i.e.*, [a] direct payment, [KUBER] feels more than confident that he can . . . get additional sums in right away."

37.    On or about July 7, 2008, **SHUSTERMAN** emailed **ROSENBERG** asking for confirmation that, before IPI moved forward with the advance to cover the Titanium interest payment, ARS would "purchase any file from any hospital with no restrictions" and an agreement that ARS would "purchase a new file for the $1.6M and $4.2M immediately."

38.     On or about July 8, 2008, KUBER emailed **ROSENBERG** suggesting that **SHUSTERMAN** and FELDMAN should consider modifying the scheme to sell IPI debt portfolios by deemphasizing collections and using "flips" (sales of portfolios after short holding periods) unless IPI could guarantee ARS would make "some minimum profit" or be "subsidized by advances."

39.     On or about July 13, 2008, KUBER emailed **SHUSTERMAN** and **ROSENBERG** to confirm that the letter of agreement, regarding the $4.2 million advance from IPI to pay ARS's interest payment to Platinum, set forth "an odd amount, rather than an even $4.2M," per **SHUSTERMAN**'s suggestion.

40.     On or about July 16, 2008, **SHUSTERMAN** and FELDMAN wired or caused to be wired an advance of $4,200,102.50 from IPI's bank account to the SPE bank account of ARS Titanium Holding, LLC.

41.     On or about August 7, 2008, **SHUSTERMAN** caused an email to be sent to KUBER setting forth the schedule for the sale of Titanium tranches to pay back IPI's $4.2 million advance to ARS.

42.     On or about August 18, 2008, **ROSENBERG** emailed **SHUSTERMAN** the dates when interest payments were due on four other ARS portfolios, as well as the year-to-date collection totals and liquidation rates, all of which were less than a tenth of the original projections.

43.     On or about August 26, 2008, **ROSENBERG** emailed FELDMAN letting him know that ARS would need assistance making an upcoming interest payment to Platinum unless there was "new money coming in from other investors."

44.     On or about September 3, 2008, **ROSENBERG** emailed KUBER to say "another Direct Pay Advance" was needed to cover that month's interest payment to Platinum.

45.     On or about September 16, 2008, KUBER emailed collection reports for an IPI debt portfolio to D.L., a trustee of the International Institute for Tropical Agriculture ("IITA"), that included IPI advances as part of the total collections.

46.     On or about September 23, 2008, **ROSENBERG** caused the emailing of a Purchase Agreement to D.L. regarding the purchase of an IPI debt portfolio via JER Receivables, LLC, in the amount of $200,000.

47.     On or about September 26, 2008, **ROSENBERG** emailed **SHUSTERMAN** suggesting a larger advance to create a cushion in the bank accounts for Portfolio One and Three because the analysts at Platinum had been "going over these numbers on a monthly basis and have been breathing down [KUBER's] neck," and because "we are telling the investor that this is a direct pay, which is part of the liquidation – of course, we cannot tell them that we are having the money advanced – as the model that was presented to them shows that the liquidation should have easily covered their first interest payment as well as all future monthly interest payments." **ROSENBERG** further stated that "we cannot have the direct pay of the Advance, which the investor believes is a direct pay, precisely equal the exact amount owed in interest, as it would look contrived."

48.     On or about September 26, 2008, and after Overt Act 47, **SHUSTERMAN** emailed **ROSENBERG** stating that he agreed with the calculations for the amount needed for the upcoming advance and "with everything else you set forth . . . [p]lease forward the wire instructions for each account along with the amount referenced . . . The funds will be wired on Monday to each designated account."

49.     On or about October 3, 2008, KUBER emailed **ROSENBERG** the year-to-date collections figures for "the two portfolios for which we must receive direct pay no later than October 30" and asking him to "try to get this to Richard [**SHUSTERMAN**] ASAP."

50.     On or about October 10, 2008, **ROSENBERG** emailed to an IPA officer an outline for potential investors in JER Receivables, LLC, stating that it had an "exclusive arrangement with the largest purchaser of medical debt portfolios in the country" and that investors could expect returns in 9 to 11 months of 50% to 66% of their initial investment based on "liquidation[s]," in addition to collections received from the "direct-pay program."

51.     On or about October 22, 2008, **ROSENBERG** caused the emailing of a signed Purchase Agreement from D.L. regarding the purchase of an IPI debt portfolio via JER Receivables, LLC, in the amount of $600,000.

52.     On or about October 30, 2008, **SHUSTERMAN** and FELDMAN used an interstate wire transfer to wire $1,320,532.06 into the SPE bank account for Portfolio Four, and $4,385,643.49 into the SPE bank account for Portfolio Five.

53.     On or about November 25, 2008, **ROSENBERG** emailed **SHUSTERMAN** stating that the advance for Portfolio Six should be adjusted to take into account the fact that "we cannot have the direct pay (which is really the advance), which the investor believes is a direct pay from the hospital, precisely equal the exact amount owed in interest, as it would look contrived."

54.     On or about December 29, 2008, **ROSENBERG** emailed **SHUSTERMAN** and FELDMAN listing the amounts of the advances needed for December and stating that they were the same as November's, however, "as these are considered Direct pays by the investor, we would like you to offset the numbers somewhat."

55.     On or about January 27, 2009, **ROSENBERG** emailed **SHUSTERMAN** and FELDMAN the information needed for the January advances stating that KUBER "skewed the numbers between portfolios so that they would not appear to be exactly the same amount per portfolio as last month.  This was done so as to show Platinum and their investors that these payments are the result of direct pays and not advances.  Please note, however, that they equal the

exact amount due to Platinum and not a penny more even though they are changed around between portfolios."

56.     On or about January 27, 2009, and after Overt Act 55, **SHUSTERMAN** emailed **ROSENBERG** saying, "Please supply the amount along with the wire instructions for each wire."

57.     On or about February 27, 2009, **SHUSTERMAN** and FELDMAN used an interstate wire transfer to transmit an advance of $2,085,473.25 to the SPE bank account for Slice 13, an IPI debt portfolio purchased by ARS with financing from IITA.

58.     On or about March 10, 2009, and in reference to Overt Act 57, KUBER sent an email to a representative of IITA claiming that a new debt portfolio had been purchased with "funds generated from the collections on the existing debt portfolios," when, in truth and fact, the new IPI debt portfolio was purchased with funds advanced by IPI.

59.     On or about April 30, 2009, **ROSENBERG** emailed **SHUSTERMAN** a document detailing the advances needed for April, which included instructions to wire a total of $5,574,417 to twenty different SPE accounts.

60.     On or about July 29, 2009, KUBER emailed **ROSENBERG** to say if FELDMAN was "not going to give us any money for dp [direct payment] now, there is no reason to meet.   It is all over.   [Platinum] will go ballistic . . . and will sue everybody and likely even report it."

61.     On or about August 24, 2009, **ROSENBERG** emailed KUBER to say that FELDMAN has "two friends who have agreed to put money in for short-term flips.   This money will be used to pay down a portion of the direct pays for August . . . [and] I am working on a few friends as well."

62.     On or about the dates listed below, **SHUSTERMAN, ROSENBERG,** FELDMAN, and KUBER fraudulently inflated or caused to be inflated the collection results for

IPI debt portfolios purchased by ARS and financed by Platinum and IITA, by wiring, or causing to be wired, advances of money in the amounts listed below to the respective SPE bank accounts for those portfolios with the fraudulent and material purpose of concealing the poor liquidation results of those portfolios and their inability to generate sufficient collections to meet periodic interest and principal payments due to Platinum and IITA:

| Date of Fraudulent Direct Payments from IPI to ARS SPEs | Amount of Fraudulent Direct Payments |
|---|---|
| July 16, 2008 | $ 4,200,102.50 |
| September 29, 2008 | $ 6,289,388.29 |
| October 30, 2008 | $ 6,676,696.38 |
| December 1, 2008 | $ 2,517,554.16 |
| December 31, 2008 | $ 1,900,022.19 |
| January 28, 2009 | $ 3,052,135.52 |
| February 2, 2009 | $    165,341.32 |
| February 27, 2009 | $ 6,662,916.08 |
| April 1, 2009 | $ 6,292,001.06 |
| May 1, 2009 | $ 2,763,152.37 |
| May 4, 2009 | $ 1,270,000.00 |
| May 5, 2009 | $    665,000.00 |
| May 6, 2009 | $    587,206.99 |
| May 29, 2009 | $ 4,636,292.71 |
| June 30, 2009 | $ 1,500,000.00 |
| August 5, 2009 | $    102,349.21 |
| October 5, 2009 | $ 2,350,000.00 |
| October 30, 2009 | $    741,449.30 |
| October 31, 2009 | $      82,093.56 |
| November 2, 2009 | $    176,457.14 |
| November 4, 2009 | $ 1,400,000.00 |
| December 2, 2009 | $    137,325.03 |
| December 4, 2009 | $    462,702.52 |
| December 8, 2009 | $    174,425.47 |
| December 18, 2009 | $    287,000.00 |
| December 24, 2009 | $ 1,088,546.98 |

63.     On or about February 15, 2010, **SHUSTERMAN** emailed **ROSENBERG** to request collection data for four ARS debt portfolios, which SHUSTERMAN wanted to send to Eton Park for its consideration of whether to invest in IPI debt portfolios.

64.     On or about February 22, 2010, **SHUSTERMAN, ROSENBERG** and KUBER caused false and fraudulent historical collection results for four ARS portfolios to be sent to Eton Park for its consideration of whether to invest in IPI debt portfolios, which results listed IPI advances as direct payments.

## C.     False Representations About Purported Resales of IPI Debt Portfolios to Third-Party Debt Buyers in the Secondary Market

### i.      Transaction 1 - The Resale of a Roundstone Portfolio to ARS

65.     On or about July 18, 2008, SHUSTERMAN emailed Roundstone investors to say that Roundstone could realize a substantial profit if it agreed to sell a particular IPI debt portfolio that it had purchased from IPI approximately 45 days earlier and use the proceeds to buy a new IPI debt portfolio.

66.     On or about July 18, 2008, after Overt Act 65, **SHUSTERMAN** emailed KUBER to see if ARS wanted to purchase the portfolio referenced in Overt Act 65 [the Roundstone portfolio] for a buy rate of 3.55%.

67.     On or about July 19, 2008, after Overt Act 66, KUBER emailed **SHUSTERMAN** telling him "[w]e will be buying the file at 3.74%."

68.     On or about July 19, 2008, **SHUSTERMAN** emailed Roundstone investors to say the debt portfolio referenced in Overt Acts 65-67 was sold.

69.     On or about July 22, 2008, **SHUSTERMAN** wired or caused to be wired $2,876,719.88 into Roundstone's bank account, representing the proceeds of the sale of its IPI debt

portfolio referenced in Overt Acts 65-68, which portfolio was resold by IPI to ARS as SPE Slice Eight.

### ii.    Transaction 2- The Resale of ARS Titanium Tranches to Greenfish

70.    On or about July 9, 2008, **SHUSTERMAN** sent an email to a Greenfish investor inquiring if he would be interested in buying "additional HMA paper that is available for immediate sale . . . as the files will be sold very quickly . . . [and] [m]any of the files in this portfolio are identified as legal files and will be sued with a higher degree of payment then a regular [sic] expected."

71.    On or about July 15, 2008, in reference to Overt Act 70, **SHUSTERMAN** caused IPI to purchase from ARS two tranches of Titanium Holding, LLC, an IPI debt portfolio previously sold to ARS and financed by Platinum.

72.    On or about July 28, 2008, **SHUSTERMAN** caused a CD containing the two tranches of the debt portfolio referenced in Overt Act 71 to be sent to the Greenfish investors who had purchased those tranches from IPI after IPI had repurchased them from ARS.

### iii.    Transaction 3 - The Resale of a Greenfish Portfolio to ARS

73.    On or about June 27, 2008, **SHUSTERMAN** emailed FELDMAN asking him to get confirmation from Greenfish that it was willing to sell one of its IPI debt portfolios.

74.    On or about June 28, 2008, in reference to the sale of the Greenfish portfolio in Overt Act 73, **SHUSTERMAN** emailed **ROSENBERG** an offer to sell the portfolio to ARS for $3,160,743.16.

75.    On or about June 28, 2008, **SHUSTERMAN** emailed a response to **ROSENBERG's** inquiry about the source of the portfolio and the price IPI was charging for it, stating "[a]ll HMA paper, appended and scrubbed [sic].  Price is dictated by supply and demand with the hospitals."

76.     On or about June 28, 2008, after Overt Act 75, **SHUSTERMAN** emailed **ROSENBERG** a liquidation letter and a buy rate for IPI's sale of the Greenfish portfolio to ARS SPE Slice Seven for $3,160,743.16.

### iv.     Transaction 4 - The Use of JER Investor Funds to Pay Advances to ARS

77.     On or about May 6, 2009, **ROSENBERG** wired $587,206.99 from JER Receivables, LLC, to IPI's bank account, which had an approximate beginning balance that day of $174,396.64, with a request that it be applied toward an advance to ARS,

78.     On or about May 6, 2009, in reference to Overt Act 77, **SHUSTERMAN** wired $587,206.99 as an advance to the ARS SPE account for Portfolio One, LLC.

### v.      Transaction 5  - The Use of IPA Investor Funds to Pay Advances to ARS

79.     On or about May 27, 2009, **ROSENBERG** wired $5,000,000 from IPA's bank account to IPI's bank account, which sum had been wired into IPA's account earlier that same day by IITA to purchase a debt portfolio.   The beginning balance for IPI's bank account that day was $58,986.51.

80.     On or around May 28, 2009, in reference to the wired funds in Overt Act 79, **SHUSTERMAN** wired $4.6 million in advances to various ARS SPE accounts and $329,625 to an investor to repurchase an IPI debt portfolio.

### vi.     Transaction 6 - The Resale of ARS Titanium Tranches to Roundstone and Then Back to ARS

81.     On or about August 4, 2008, **SHUSTERMAN** sent an email to Roundstone investors advising them that an HMA portfolio "with a high number of legal accounts is now available for sale."

82.     On or about August 4, 2008, after Overt Act 81, **SHUSTERMAN** advised KUBER that he had a buyer for three tranches of ARS SPE Titanium Holding, LLC.

83.     On or about August 4, 2008, in reference to Overt Act 81, **SHUSTERMAN** sent an email to Roundstone investors falsely stating that the "paper you are buying originated from 1-2 new hospitals we have been working on for the last 14 months.   The new files will close within one week and will then be sold to you."

84.     On or about August 6, 2008, **SHUSTERMAN** caused wire transfers in the approximate amount of $8,000,000 to be sent from Roundstone's bank account to IPI's bank account to purchase the three tranches of the IPI debt portfolio previously owned by ARS SPE Titanium Holding, LLC, as referenced in Overt Acts 81-83.

85.     On or about September 10, 2008, **SHUSTERMAN** caused a wire transfer in the approximate amount of $4,800,029 to be sent from ARS's bank account to IPI's bank account for ARS Slice Ten-5 to purchase two of the Titanium tranches originally owned by both Titanium and Roundstone as referenced in Overt Acts 81-84.

**vi.     Other Overt Acts**

86.     On or about July 8, 2008, **SHUSTERMAN** emailed Roundstone investors to say that he had a "great opportunity to maximize your profit by selling many of the files you currently own . . . I suggest you take the $$ and buy a new file."

87.     On or about October 14, 2008, **ROSENBERG** sent or caused to be sent an email to KUBER advising that FELDMAN wanted assurances that Platinum would continue to finance ARS's purchase of IPI debt portfolios.

88.     On or about January 6, 2009, **SHUSTERMAN** emailed FELDMAN a flow chart to provide to Greenfish which summarized substantial annual rates of return in 2008 for IPI debt portfolios, including those of ARS and Roundstone, based solely on repurchases and resales, and claimed that "the sums listed do not include weekly collections which in some cases can average

roughly 30% to 35% of the original purchase amount within a 12 month span.   [T]he sum must be added to the sale amount."

89.   On or about July 9, 2009, **SHUSTERMAN** emailed FELDMAN a proposed response to an inquiry from a Roundstone investor which falsely stated that "[a]ll files sold to roundstone have been purchased directly by ipi from the hospitals we deal with within 60 days of a sale to roundstone."


18 U.S.C. § 1349

## COUNTS TWO THROUGH TEN

(Wire Fraud)

And the Grand Jury for the District of Maryland further charges that:

1.      The allegations contained in Paragraphs 1-19 and 21-46 of Count One are realleged and incorporated by reference as though fully set forth in this Count.

2.      On or about the dates listed below, in the District of Maryland and elsewhere, the defendants,

### RICHARD SHUSTERMAN and
### JONATHAN E. ROSENBERG,

for the purpose of executing and attempting to execute the scheme to defraud, did knowingly cause to be transmitted by means of wire communication in interstate and foreign commerce writings, signs, sounds and signals, namely, the wire transmissions set forth below:

| COUNT | DATE | DOCUMENT |
| --- | --- | --- |
| 2 | September 14, 2008 | Email transmission from D.L. in West River, Maryland, to S.S. in Ibadan, Oyo State, Nigeria, regarding IITA's due diligence before investing in medical accounts receivable via ARS. |
| 3 | September 16, 2008 | Email transmission from D.L. in West River, Maryland, to S.S. in Ibadan, Oyo State, Nigeria, summarizing a meeting in New York City regarding IITA's proposed $10 million asset-based investment in medical accounts receivable via a loan to ARS. |
| 4 | September 16, 2008 | Email transmission from S.S. in Ibadan, Oyo State, Nigeria, to D.L. in West River, Maryland, regarding IITA's Board of Trustees' consideration of an investment in medical accounts receivable via ARS. |
| 5 | September 16, 2008 | Email transmission from D.L. in West River, Maryland, to KUBER in Livingston, New Jersey, requesting a letter of recommendation from Platinum vouching for its experience with investments in medical accounts receivable via ARS. |

| 6 | September 17, 2008 | Email transmission from KUBER in Livingston, New Jersey, to D.L. in in West River, Maryland, attaching an executive summary of proposed investment in medical accounts receivable. |
| 7 | September 18, 2008 | Email transmission from D.L. in West River, Maryland, to S.S. in Ibadan, Oyo State, Nigeria, summarizing IITA's proposed investment in medical accounts receivable via ARS. |
| 8 | May 14, 2009 | Email transmission from D.L. in West River, Maryland, to S.S. in Ibadan, Oyo State, Nigeria, confirming the terms of IITA's proposed $5 million investment in an IPI debt portfolio via a loan to IPA. |
| 9 | May 22, 2009 | Email transmission from D.L. in West River, Maryland, to S.S. in Ibadan, Oyo State, Nigeria, forwarding the closing documents for IITA's $5 million loan to IPA to purchase an IPI debt portfolio. |
| 10 | May 27, 2009 | Email transmission from D.L. in West River, Maryland, to S.S. in Ibadan, Oyo State, Nigeria, confirming IPA's receipt of a $5 million wire transfer from IITA's bank account for the purchase of an IPI debt portfolio. |

18 U.S.C. § 1343

## FORFEITURE

The United States Attorney for the District of Maryland further charges that:

1.       Pursuant to 18 U.S.C. Section 981(a)(1)(C) and 28 U.S.C. Section 2461(c), upon

conviction of an offense in violation of 18 U.S.C. § 1349, as alleged in Count One, and in

violation of 18 U.S.C. § 1343, as alleged in Counts Two through Ten the defendant shall forfeit

to the United States of America all property, real and personal, which constitutes and is derived

from proceeds traceable to the scheme to defraud.

2.       The property to be forfeited includes, but is not limited to, the following:

     a.       Condominium Unit 808, Parc Rittenhouse Condominium, 219-29 South 18th Street, Philadelphia, PA, 19103.
     b.       A sum of money equal to the value of the proceeds of the scheme to defraud, which amount is at least $278,105,193.

3.       If any of the property described above, as a result of any act or omission of the defendants:

     a.       cannot be located upon the exercise of due diligence;
     b.       has been transferred or sold to, or deposited with, a third party;
     c.       has been placed beyond the jurisdiction of the court;
     d.       has been substantially diminished in value; or
     e.       has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title

21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section

2461(c).

18 U.S.C. § 981(a)(1)(C); 18 U.S.C. § 1956(c)(7); 18 U.S.C. § 1961(1); 28 U.S.C. § 2461(c); Rule 32.2(a), F.R.Crim.P.

Rod J. Rosenstein
United States Attorney
District of Maryland

**SIGNATURE REDACTED**

Foreperson

9/4/13

Date